**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

| | |
|---|---|
| CARRIAGE HILL MANAGEMENT, LLC, | * |
| Plaintiff, | Case No.: GJH-17-2208 |
| v. | * |
| BOSTON LOBSTER FEAST, INC., | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Carriage Hill Management, LLC brings a claim of breach of contract against Defendant Boston Lobster Feast, Inc. ("Defendant" or "the Company"), alleging Defendant entered into a transaction to sell all of its assets without paying Plaintiff an Advisory Fee due under the terms of an agreement negotiated between the parties. Presently pending before the Court is Plaintiff's Motion for Sanctions, ECF No. 36, Plaintiff's Motion for Summary Judgment, ECF No. 44, and Defendant's Cross Motion for Summary Judgment, ECF No. 64. No hearing is necessary. Loc. R. 105.6 (D. Md. 2016). For the following reasons, Plaintiff's Motion for Summary Judgment will be granted as to Plaintiff's claim for payment of an Advisory Fee and denied as to Plaintiff's claim for production of Transaction documents. Plaintiff's Motion for Sanctions will be denied. Defendant's Cross Motion for Summary Judgment will be denied in part and granted in part.[1]

---

[1] In addition, the Court will grant Plaintiff's motions to seal certain exhibits that contain Defendant's proprietary information, ECF Nos. 39, 57.

1

**I. BACKGROUND**

The following facts are not in dispute. Plaintiff is a Delaware corporation that identifies, evaluates, and develops merger and acquisition opportunities for its clients. Defendant is a wholesale and retail seafood company incorporated in Florida. On or about January 5, 2016, Plaintiff and Defendant entered into an agreement whereby Plaintiff would "advise the Company in connection with exploring a sale of all or substantially all of the assets or stock of the Company." ECF No. 45-2 at 1 (the "Agreement").[2] In return, Defendant was obligated to pay Plaintiff a work fee of $5,000 per calendar month during the first six months of the Agreement and pay Plaintiff an Advisory Fee as follows:

> If, as and when the Company consummates a Transaction, including, without limitation, any investment, sale or merger transaction which was pursued by the Company during the Term and closes during the Term or Tail Period of this Engagement (a "Transaction"), the Company shall pay to Carriage Hill a fee (the "Advisory Fee") equal to 4% of the purchase price. The "purchase price" shall equal the price paid by the buyer (as agreed upon in the purchase agreement) or the total gross amount paid in connection with the Transaction, whether in cash, notes, stock or other securities, including debt and equity financing. plus the total amount of any assumed debt or liabilities.

*Id.* § 2(a). The Term of the Agreement commenced on the date it was signed and was set to expire one year later unless terminated by either party upon thirty days written notice. *Id.* §§ 4(a), (b). The Tail Period commenced "upon expiration or termination and [would] end three years later." *Id.* § 4(a). Furthermore, the Agreement specified that the Advisory Fee would become due if the Transaction was consummated during the Term or if the Transaction was initiated during the Term but consummated during the Tail Period as follows:

> In order for a Transaction that closes during the Tail Period to generate Advisory Fees, the investor shall have been introduced to the Company or such Transaction

---

[2] The Agreement is governed by the laws of the state of Maryland, and the parties have agreed that any action related to the Agreement shall fall under the "exclusive jurisdiction of any State or Federal Court sitting in Maryland." ECF No. 45-2 § 6. Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

> must be pursued by the Company during the Term, with the latter as evidenced by a target list agreed upon by the parties, one or more direct calls or meetings with the potential acquirer/investor or target, or execution of a confidentiality agreement with the potential acquirer/investor or target. . . .

*Id.* § 2(d).

Once the parties ratified the Agreement, Plaintiff commenced work on behalf of Defendant and presented Defendant with at least two written offers, neither of which resulted in a Transaction. ECF No. 45-3 at 3; ECF No. 70-1 at 28. Defendant was not obligated "to accept any Transaction or to enter into any definitive agreement or letter of intent with any party making an offer or responding to an offer." ECF No. 45-2 at 1. Plaintiff also provided Defendant with a target list that included "a number of private equity firms [and] a few non-institutional investors." ECF No. 70-1 at 56. After Defendant paid Plaintiff all work fees due under the Agreement, Defendant terminated the Agreement by letter dated July 20, 2016 because Defendant wanted to take the Company "off the market for a while." ECF No. 45-17. Pursuant to the Agreement, Defendant's termination was effective as of August 19, 2016, and the Tail Period continued for an additional three years, until August 19, 2019.[3]

During the week of August 1, 2016, and still within the Term of the Agreement, Defendant attended the Red Lobster Conference where Defendant's President, Jeff Hazell, met with George Holm, Chief Executive Officer of Performance Food Group ("Performance"). ECF No. 45-3 at 4; ECF No. 67-1 at 17. Hazell and Holm had a number of conversations during the Red Lobster Conference. While Hazell pursued selling seafood to Performance, ECF No. 74-1 at 8–9, Holm asked Hazell if it made sense for Performance to purchase the Company instead, ECF No. 67-1 at 16–17. On August 3, 2016, during the Red Lobster Conference, Hazell provided

---

[3] The record contains testimony that Defendant first attempted to terminate the Agreement on April 28, 2016. ECF No. 69-1 at 35. However, Defendant does not argue that the Agreement was actually terminated at that time. *See* ECF No. 65 at 6 (stating, as an undisputed fact, that termination of the Agreement became effective on August 19, 2016).

3

Holm with a copy of the Company's 2015 and 2016 year-to-date income statements. ECF No. 47. That same day, Holm informed Hazell that James Hope, Performance's Executive Vice President of Operations, would be contacting Hazell to arrange a visit to the Company on August 24 and 25 in preparation for discussions regarding a possible acquisition. *See* ECF No. 50; ECF No. 51; ECF No. 67-1 at 40; ECF No. 69-1 at 57; ECF No. 74-1 at 9–10; *see also* ECF No. 68-1 at 29 (Hope Deposition) (Hope indicating that he contacted Hazell on or around August 4 to talk about acquiring the Company).

On August 23, 2016, Defendant entered into a "Confidentiality Agreement Relating to a Proposed Transaction" with Performance. ECF No. 54. On October 7, 2016, Defendant and Performance signed a "Letter of Intent to Purchase Certain Assets of [the Company] and Certain Related Real Property." ECF No. 55. Finally, on January 17, 2017, and within the Tail Period of the Agreement, Defendant and Performance entered into an Asset Purchase Agreement. ECF No. 56. The value of the acquisition established through the Asset Purchase Agreement was $41,735,000.00. ECF No. 45 at 13 (citing ECF No. 46 at 3). Plaintiff admits that Performance was not listed on its target list, that Plaintiff did not otherwise participate in any negotiations or discussions between Performance and Defendant, did not attend any meetings with Performance, and did not have any telephone calls with Performance. ECF No. 70-7 at 16.

## II. STANDARD OF REVIEW

A party may move for summary judgment under Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings . . . together with the affidavits, if any, which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 466 U.S. 317, 323 (1986) (internal citation omitted). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). To withstand a motion for summary judgment, the nonmoving party must do more than present a mere scintilla of evidence. *Phillips v. CSX Transport, Inc.*, 190 F.3d 285, 287 (4th Cir. 1999). Rather, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. No genuine issue of material fact exists if the non-moving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *See Celotex*, 477 U.S. at 322–23. Although the Court should draw all justifiable inferences in the nonmoving party's favor, the nonmoving party cannot create a genuine issue of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "The Court must deny both motions if it finds there is a genuine issue of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Wallace v. Poulos*, No. DKC 2008-0251, 2009 WL 3216622, at *4 (D. Md. Sept. 29, 2009) (internal citation omitted).

## III. DISCUSSION

### A. Breach of Contract

The instant litigation ultimately boils down to a dispute over the meaning of certain provisions in the Agreement. Maryland follows the principle of the objective interpretation of contracts. *Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007). "The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake." *Kasten Constr. Co., Inc. v. Rod Enterprises, Inc.*, 301 A.2d 12, 17 (Md. 1973) (citations omitted). Under this principle, if a contract's language is unambiguous, then the Court gives effect to its plain, ordinary, and usual meaning, taking into consideration the context in which the language is used. *See CX Reinsurance Co. Ltd. v. Levitas*, 207 F. Supp. 3d 566, 574 (D. Md. 2016) (citing *John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1074 (Md. 2010)); *see also Cochran*, 919 A.2d at 710 ("Ambiguity arises if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning."). Here, Defendant contends (1) that a "Transaction" triggering the payment of an Advisory Fee requires advice provided by Plaintiff and (2) that the actions undertaken by them during the term did not amount to "pursuit" of the eventual agreement with Performance, which is a required condition for Plaintiff's entitlement to an Advisory Fee for a sale made during the Tail Period of the agreement. Both arguments are addressed herein.

### 1. Was this a "Transaction" under the Agreement?

It is undisputed that the Company was sold to Performance during the Tail Period of the Agreement and that Plaintiff did not have any direct involvement with the Transaction.[4] But under the plain language of the contract, Plaintiff is entitled to the Advisory Fee regardless of whether it directly participated in the Transaction or introduced Defendant to the ultimate buyer. While the Agreement does not explicitly state that Plaintiff will receive the Advisory Fee even if it played absolutely no role in facilitating the Transaction, the Agreement makes clear that such a result is permissible. Pursuant to Section 2(a), Plaintiff is owed the Advisory Fee when "the Company consummates a Transaction, including, *without limitation*, any investment, sale or merger transaction which was pursued by the Company during the term . . . ." ECF No. 45-2 § 2(a) (emphasis added). Nowhere in this provision does Plaintiff have an affirmative duty to directly participate in the Transaction in order to recover the Advisory Fee. While different sections of the Agreement require Plaintiff to introduce Defendant to potential investors, which they did, the Agreement does not make receipt of the Advisory Fee contingent on the buyer being found by Plaintiff.

Defendant argues that an Advisory Fee is only required upon a "Transaction" and that the introductory paragraph in the Agreement defines "Transaction" to be "the sale of all or substantially all of Defendant's assets *in which Defendant received advice from Plaintiff*." ECF No. 65 at 11 (citing ECF No. 45-2 at 1) (emphasis in ECF No. 65). Not so. There are two places in the Agreement where the word "Transaction" appears to be defined. First, the introductory paragraph states that Defendant is retaining Plaintiff "to advise the Company in connection with exploring a sale of all or substantially all of the assets or stock of the Company, as more fully

---

[4] While Plaintiff admits that it did not negotiate or document Performance's acquisition of the Company, Plaintiff does maintain that it "helped create the market surrounding the sale of [the Company]." ECF No. 70-7 at 16.

described herein (a "Transaction")." ECF No. 45-2 at 1. A clear reading of this language leads to the conclusion that a "Transaction" is defined as "a sale of all or substantially all of the assets or stock of the company." While Plaintiff was being engaged to advise Defendant as it explored such a Transaction, the plain language of the Agreement does not make the advice a part of the definition of a Transaction. Similarly, is Section 2(a), the Agreement appears to define "Transaction" a second time, referring to "any investment, sale or merger transaction which was pursued by the Company during the Term and closes during the Term or Tail Period of this Engagement (a "Transaction")." *Id.* § 2(a). This too does not require Plaintiff's direct involvement to create a Transaction. Because the Agreement is clear, the Court does not need to inquire into whether either party intended for Plaintiff to receive the Advisory Fee based only on transactions that it had direct involvement in. *See Kasten*, 301 A.2d at 18 ("where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed," regardless of the parties' intent). A Transaction occurred, triggering payment of the Advisory Fee.

### 2. Did Defendant "pursue" a Transaction during the Term of the Agreement?

Defendant's conduct during the Red Lobster Conference, which occurred during the Term of the Agreement, was sufficient to trigger the Advisory Fee. The Agreement is drafted with broad and open-ended language, stating that the Advisory Fee will be awarded if a transaction that closed during the Tail Period "was pursued by the Company during the Term." ECF No. 45-2 § 2(a). Defendant argues that because Performance pursued Defendant, and not the other way around, the eventual acquisition was outside the scope of the Agreement. ECF No. 65 at 12. However, Defendant's narrow and one-directional interpretation of "pursued" finds no

support when read in context with the rest of the Agreement.[5] *See Cochran*, 919 A.2d at 710 (A "contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.").

Section 2(d) establishes when an Advisory Fee is owed for Transactions closing during the Tail Period: "the investor shall have been introduced to the Company *or* such Transaction must be pursued by the Company during the Term, with the latter as evidenced by a target list agreed upon by the parties, [or] one or more direct calls or meetings with the potential acquirer/investor or target . . . ." ECF No. 45-2 § 2(d) (emphasis added). Thus, as per the terms of the Agreement, "pursued" includes any direct calls or meetings between Defendant and the potential acquirer/investor. Defendant's conduct, wherein they were introduced to Performance at the Red Lobster Conference and subsequently engaged in calls and meetings with them during the Term, satisfies this provision.[6] Therefore, the Court finds that, under the Agreement's clear and unambiguous language, Plaintiff is entitled to the Advisory Fee.[7]

**B. Damages**

Pursuant to the Agreement, the Advisory Fee is calculated at 4% of the "purchase price." Defendant argues that the total purchase price negotiated between Defendant and Performance included real estate, which should not be considered in calculating any Advisory Fee award to

---

[5] Nor does Defendant's interpretation fit within the common understanding of the term. *See* Black's Law Dictionary (10th ed. 2014) (defining "pursue" as, *inter alia*, "to continue trying to find out about").

[6] At the start of the Agreement, Defendant provided Plaintiff with a one page table of recently-closed transactions that lists Performance as a "target" in a transaction announced on January 18, 2008. ECF No. 45-6. Plaintiff contends that this is a "target list" as referenced in the Agreement. Because Defendant and Performance had direct calls or meetings during the Term of the Agreement, the question of whether the table is a "target list" is immaterial.

[7] Plaintiff's Complaint refers to a separate breach based on Defendant's failure to provide certain documents related to the transaction. ECF No. 2 ¶ 31. Because Plaintiff does not identify how it was damaged by this alleged breach, and any damages would likely be superfluous to those being awarded, this portion of the claim will be dismissed.

9

Plaintiff because neither of the deals that Plaintiff presented to Defendant included the purchase of real estate. ECF No. 65 at 9; *see also* ECF No. 74-1 (noting that Defendant declined an offer $26,681,000 brought by Plaintiff); ECF No. 70-1 at 28 (Deposition of S. Klein) (Klein indicating that "[i]n most cases I would expect that [the two potential buyers identified by Plaintiff] would not have bought the real estate"). But the Agreement neither precludes calculation of the Advisory Fee based on the sale of real estate nor limits the Advisory Fee to the value of offers obtained by Plaintiff. Instead, the Agreement uses expansive language in characterizing the "purchase price" to include "the price paid by the buyer (as agreed upon in the purchase agreement) or the total gross amount paid . . . whether in cash, notes, stock, or other securities, including debt and equity financing plus the total amount of any assumed debt or liabilities." ECF No. 45-2 § 2(a); *see also id.* at 1 (the parties will explore "a sale of all or substantially all of the assets or stock of the Company"). Therefore, Plaintiff is entitled to an advisory fee based on 4% of Performance's $41,735,000.00 purchase price, or $1,669,400.00.[8]

### C. Motion for Sanctions

Plaintiff moves for sanctions against Defendant pursuant to Federal Rule of Civil Procedure 37, alleging that Defendant intentionally failed to produce responsive documents during discovery, failed to properly implement procedures to preserve discoverable information (*i.e.*, a "litigation hold"), and deleted relevant emails and text messages. ECF No. 37. Pursuant to Rule 37(b)(2)(A), a Court may sanction a party that "fails to obey an order to provide or permit discovery." Possible sanctions include directing that contested matters be taken as true, striking pleadings, staying proceedings, dismissing the action, or holding the party in contempt of court.

---

[8] The Agreement also provides that if any party brings an action directly or indirectly based upon the Agreement, the prevailing party shall be entitled to recover its reasonable costs and expenses, including attorneys' fees. ECF No. 45-2 § 6. Plaintiff seeks recovery of such costs and expenses but has not proposed an amount to support any award by the Court at this time. Plaintiff may seek recovery of such costs and expenses through a separate motion.

*See* Rule 37(b)(2)(a)(i)–(vii). However, these sanctions are predicated on the violation of a court order. In this case, no such order exists.

When discovery disputes arise, Local Rule 104.8 directs the parties to serve motions to compel and confer with one another without engaging the Court. Parties are only directed to engage the Court if they are unable to resolve their disputes. Thereafter, a party may schedule a conference with the Court, but the Court will not consider any discovery motion unless "the moving party has filed a certificate reciting (a) the date, time, and place of the discovery conference . . . , or (b) counsel's attempts to hold such a conference without success; and (c) an itemization of the issues requiring resolution by the Court." Loc. R. 104.7. Plaintiff alleges that on or about November 13, 2017, it served Defendant with a motion to compel discovery responses. ECF No. 62 at 3 n.2. Thereafter, the Court held a discovery conference call on November 27, 2017. ECF No. 34. In advance of the call, each party provided the Court with correspondence relating to their specific dispute; namely, whether Defendant was required to produce post-October 1, 2016 correspondence between itself and Performance and what documentation Defendant must provide to establish the purchase price of the Performance transaction so as to calculate the Advisory Fee. ECF Nos. 29, 30. Following the call, the Court issued a Paperless Order, stating that "the parties have reached agreement on the scope of discovery and Defendants will produce the agreed upon discovery material on or before Tuesday, December 5, 2017." ECF No. 34. The Court did not explicitly direct any action from either party; rather, the call served as an informal means to allow the parties to resolve their discovery dispute. Following the call, the parties captured the agreed-upon resolution outside of the purview of the Court. ECF No. 37-2. To the extent that Plaintiff was dissatisfied with Defendant's compliance with that agreement, Plaintiff could have sought additional assistance

from the Court. However, because it did not, and because the Court's Paperless Order did not mandate any particular action, the Court finds that Plaintiff is not entitled to relief under Rule 37(b)(2). *See White v. Office of the Public Defender of the State of Md.*, 170 F.R.D. 138, 147 (D. Md. 1997) ("[B]efore a party can be sanctioned under [Rule 37(b)(2)], an order compelling production of the document must be violated."). Alternatively, even if Defendant's purported violation of the Paperless Order warrants sanctions under Rule 37(b)(2), Plaintiff has obtained sufficient evidence to support an award of summary judgment, and such a ruling in Plaintiff's favor obviates the need to impose additional sanctions.

Beyond Rule 37, the Court may also impose sanctions under its inherent power to manage the judicial process. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 517 (D. Md. 2010). Sanctionable conduct includes spoliation of evidence, *i.e.*, "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Id.* at 515–16 (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). In the Fourth Circuit, to prove spoliation that warrants a sanction, a party must show:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Victor Stanley*, 269 F.R.D. at 520–21 (citing *Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009)).

Plaintiff alleges that Defendant intentionally withheld or destroyed key documents evincing Defendant's breach of the Agreement and that these documents were only revealed to Plaintiff through third-party subpoenas served upon Performance. These documents, many of

which included emails between Performance and Defendant, were clearly responsive and should have been produced by Defendant if in its possession. While the record suggests that Defendant failed to preserve these documents, the Court cannot definitively state whether or not Defendant took reasonable actions in advance of pending litigation. In Hazell's December 11-12, 2017 Deposition, he testified that the Company did not have an email retention protocol, ECF No. 37-14 at 2; he had deleted emails "all of the time" since February of 2017, ECF No. 37-15 at 2; and that he did not know whether he had taken steps to preserve emails related to this case, ECF No. 37-16 at 3. In addition, Alfredo Marasigan, Defendant's Information Technology Manager, testified that he was never asked to gather documents or put a hold on any company deletion policies related to this lawsuit. ECF No. 37-18. However, Defendant believes Marasigan's testimony was mistaken and has provided an affidavit from Leonard Lesperance, the Company's Chief Financial Officer, on February 5, 2018 stating that in June of 2016, he instructed Marasigan "to preserve all electronic documentation, including emails, on Jeffrey Hazell and my computers until otherwise notified." ECF No. 43-4 ¶ 3.

Regardless, the record does not suggest that Defendant *intentionally* deleted or withheld responsive documents or otherwise had a culpable state of mind to warrant sanctions. *See, e.g.,* ECF No. 37-17 at 3 (Lesperance testifying that while he had routinely deleted emails, he had not done so "since we received a notification from our attorneys not to delete any of our e-mails that might be relevant"). Plaintiff's Motion for Sanctions will be denied.[9]

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Sanctions, ECF No. 36, shall be denied. Defendant's Cross Motion for Summary Judgment, ECF No. 64, shall be denied in part and

---

[9] Although the Court declines to impose sanctions against Defendant, including attorneys' fees, the Court recognizes that Plaintiff may seek to recover such fees pursuant to Section 6 of the Agreement.

granted in part.[10] Plaintiff's Motion for Summary Judgment, ECF No. 44, shall be granted in part and denied in part. A separate Order follows.

Dated: July 6, 2018                        /s/
                                                             GEORGE J. HAZEL
                                                             United States District Judge

---

[10] The portion of Plaintiff's claim regarding failure to produce documentation is dismissed.